IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 25, 2020

## STATE OF TENNESSEE v. DAVID OESER

**Appeal from the Circuit Court for Rutherford County**
**No. 78218    David Bragg, Judge**

———————————————————

### No. M2019-01052-CCA-R3-CD

———————————————————

A Rutherford County jury convicted the Defendant, David Oeser, as charged of first degree premediated murder, first degree felony murder, especially aggravated robbery, aggravated burglary, and tampering with evidence.  See Tenn. Code Ann. §§ 39-13-202(a)(1), (a)(2), 39-13-403, 39-14-403, 39-16-503.   The trial court imposed life sentences for the Defendant's first degree murder convictions before merging them.  It then sentenced the Defendant to twenty years at one hundred percent for the especially aggravated robbery conviction, five years at thirty percent for the aggravated burglary conviction, and five years at thirty percent for the tampering with evidence conviction, with these sentences served concurrently with one another but consecutively to the life sentence, for an effective sentence of life plus twenty years.  On appeal, the Defendant argues:  (1) the evidence is insufficient to sustain his conviction for first degree premeditated murder; and (2) the trial court abused its discretion in ordering the sentences for the especially aggravated robbery, aggravated burglary, and tampering with evidence convictions served consecutively to his life sentence.  After carefully reviewing the record and the applicable law, we remand the case for entry of corrected judgment forms in Counts 1 and 3 as specified in this opinion. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

H. Scott Saul, Nashville, Tennessee, for the Defendant-Appellant, David Oeser.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

This case arises from a March 31, 2017 incident in which the victim, James Whitehead, was killed, and several items of property were stolen from his home. During the incident, the victim was bludgeoned in the head with a sledgehammer, the victim's throat was cut, and the victim was stabbed in the abdomen. Following an investigation, the Defendant was arrested for these offenses. In September 2017, a Rutherford County grand jury indicted the Defendant for first degree premediated murder, first degree felony murder, especially aggravated robbery, aggravated burglary, and tampering with evidence.

At trial, Leah Whitehead Graves testified that the victim in this case was her brother. She stated that Jay Foster, the victim's roommate, lived at the victim's home at 338 One Mile Lane, Smyrna, Tennessee.

Graves[1] explained that, shortly before the victim's death, the victim began keeping large sums of money in his home because he was starting a tire business and generally paid for the costs of this business with cash. She identified photographs of a leaf blower, a chainsaw, and two guns that belonged to the victim. Graves said that the victim did not keep tools at his home and routinely hired friends to do work on his property. She denied ever seeing a Stanley brand sledgehammer on the victim's property and asserted that if the victim had purchased a sledgehammer, he would have bought a Wilton brand sledgehammer because she worked for a company that makes Wilton tools. Graves said the victim owned a fish fillet knife that he kept in a drawer in his kitchen.

Jessica Adcock, the victim's niece, testified that she and her husband had lived with the victim from 2013 to August 2016 and that during that time, her husband often did handy work around the victim's home. She said that when they moved out, her husband took his tools, including a sledgehammer, with him. She also said that she had never observed the victim having a sledgehammer because he was not handy and did not have tools. Adcock identified a photograph of the victim's leaf blower. She also identified a photograph of the victim's fillet knife, which he kept in a kitchen drawer, and said she knew the victim had a rifle and shotgun, which he kept in his bedroom.

Jay Foster, the victim's roommate, testified that he saw and talked to the victim around 10:30 a.m. on March 31, 2017, as he got ready to go to work. As Foster left for work, he saw the Defendant, David Oeser, arrive at the victim's home. When Foster returned home at 1:50 p.m., he found the victim lying on the floor "disfigured" with "a

---

[1] We have not used titles when referring to most of the witnesses in this opinion, and we intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful, even though none is intended, and he would prefer that every adult witness be identified by his or her proper title.

knife sticking out of his stomach." He said this knife was the fish fillet knife from victim's kitchen. Upon finding the victim, Foster immediately called 9-1-1 and waited in front of the home for the police to arrive.

Foster said that he was familiar with all of the tools the victim kept at his residence and asserted that the victim did not have a Stanley sledgehammer, or any other sledgehammer, in his home or his garage. Foster identified photographs of a leaf blower, chainsaw, shotgun, and rifle that belonged to the victim. He acknowledged that the victim used drugs recreationally but said that he had never seen the victim sell drugs.

Joseph Duncan, a patrol officer with the Rutherford County Sheriff's Department, testified that when he arrived at the crime scene, he observed the victim lying on the floor with serious trauma to his face and head and with a knife sticking out of his abdomen. He noticed a substantial amount of blood on the floor, the walls, and a nearby table. Officer Duncan exited the home and approached Jay Foster, who told him that he had come home, unloaded his pressure washing equipment, removed equipment to seal the sidewalk, and then gone inside the home where he discovered the victim. Officer Duncan noted that Foster's keys were in the lock, his shoes were outside the door, and his concrete sealer and applicators were by the sidewalk he was going to seal, which corroborated Foster's statements to him.

Richard Brinkley, a detective and crime scene investigator with the Rutherford County Sheriff's Department, testified that he took photographs of and collected evidence from the crime scene. Detective Brinkley noticed several "tool marks," represented by "linear furrows," on the wall near the victim that appeared to be caused by "something being swung up and down." He said that these tool marks were consistent with being struck by a sledgehammer. Detective Brinkley also noted that the table near the victim had a cell phone, a leather sheath used to cover the knife with which the victim had been stabbed, some pooling of blood, and "two tool marks" on it that were "circular" and were consistent with the table being struck with a sledgehammer. He said that because these tool marks had blood stains around them, he believed the weapon that made these marks had been used to kill the victim. He noticed that there was a large amount of blood spatter at the scene, which was indicative of trauma to the body. He also said that a set of scales were found on the floor next to the victim's body. In addition, he observed blood stains in the master bedroom on the carpet, the bed, a baseball card, and a ball cap found in the closet.

Detective Brinkley said he later assisted several officers in apprehending the Defendant, who had been identified as a suspect in the victim's death. After the Defendant was taken into custody, he and other officers executed a search warrant on the Defendant's home, where a chainsaw and a leaf blower were found in a shed on the Defendant's

property. In addition, blood stains were found in the Defendant's truck on the driver's door handle and the passenger's door.

Kyle Norrod, a detective with the Rutherford County Sheriff's Department, testified that he was assigned to investigate this case. He arrived at the victim's home at 2:30 or 2:40 p.m. on March 31, 2017, and promptly spoke to paramedics, the first responding officers, and Jay Foster, who had found the victim. Detective Norwood entered the kitchen and observed blood stains on the floor, the wall, and the ceiling. He also noticed "four district strikes from an object" close to the bottom of the wall, which indicated that whatever was being struck "was already on the floor."

After learning that the victim had surveillance equipment installed outside his home, Detective Norrod obtained the video recordings from this equipment, which showed that a truck and a person wearing gloves and a yellow jacket, later identified as the Defendant, was believed to have committed the crimes at the victim's home. Detective Norrod was able to obtain photographs from the video recordings, which he showed to the victim's friends, Michael Sullivan and Steve Pigue, who both identified the Defendant. Over the course of the investigation, Detective Norrod learned that a chainsaw, a leaf blower, baseball cards, a shotgun, and a .22 rifle had been taken from the victim's residence. He said that the gloves and the yellow jacket the Defendant was wearing on the surveillance video recording were never recovered.

Detective Norrod then obtained a warrant for the Defendant's arrest, and the Defendant was taken into custody. In the early morning hours of April 2, 2017, Detective Norrod provided the Defendant with his Miranda warnings, both in writing and verbally, and the Defendant signed a waiver of rights form and affirmed that he was not under the influence of any drugs prior to the interview. Detective Norrod asserted that the Defendant responded appropriately to questions asked of him and that there was nothing unusual about the Defendant's physical or mental conduct during the interview. He said the Defendant's interview was audio and video recorded.

Detective Norrod said that during the interview, the Defendant initially acknowledged that he had been at the victim's home but denied knowing that anything had happened to the victim and denied taking anything from the victim's home. The Defendant also claimed that he called and texted the victim after he left the victim's home, which Detective Norwood confirmed. Later, the Defendant admitted that he took the victim's shotgun but claimed that he never went into the victim's closet. He also denied wearing a hat into the victim's house. During the first fifty-four minutes of the interview, the Defendant never indicated that he knew the victim was dead and said he did not know that the victim's home had surveillance video cameras. The Defendant admitted he took a shotgun from the victim's house but claimed that he did not know the victim was dead.

- 4 -

During the next thirty-two minutes of the interview, the Defendant admitted that he had initially lied about what happened with the victim. Instead, the Defendant asserted that the victim and Jay Foster had been arguing when he arrived at the victim's home and that a short time later Foster came into the home and hit the victim in the head with a hammer two or three times, which prompted the Defendant to run to the bedroom to try to get a shotgun. The Defendant said that when he came out of the bedroom, the victim was still alive but making noises, and he never called the police because he left to try to find Foster.

During the last portion of the interview, the Defendant admitted that he had hit the victim in the head with a Stanley mini sledgehammer because the victim was angry with him for bringing only $60 when he was supposed to have $619 and because the victim called him a name, which caused him to see "red." When one of the detectives asked him about the knife that was found at the scene, the Defendant claimed the victim had pulled a knife on him and held it to his head before he hit the victim with the sledgehammer. The Defendant said that after he hit the victim with the sledgehammer, the victim began making gurgling noises, which prompted him to stab the victim in the stomach to stop him from making those noises. The Defendant said he was the only person present at the victim's house when this incident occurred. The Defendant never explained where the sledgehammer came from or what he did with it after hitting the victim. The Defendant also never said anything about cutting the victim's throat. The Defendant's entire interview, which corroborated Detective Norrod's testimony about it, was played for the jury and entered into evidence.

Detective Norrod stated that he believed the Defendant had placed the sledgehammer in his father-in-law's tool box when he visited him the day after the victim's murder. He said that because the Defendant had been incarcerated since his arrest, someone else had to have taken the sledgehammer from the father-in-law's toolbox back to the Defendant's residence, where it was found by Tracy Byrd, the Defendant's sister-in-law, during home renovations.

Detective Norrod said that everything in the victim's pockets went with the victim to the Medical Examiner's office and that he later learned the victim had a few hundred dollars in his pockets. Detective Norrod acknowledged that a set of digital scales was found in the victim's home and that such scales were sometimes used to weigh small amounts of drugs. He said that although the victim's family had disclosed that the victim often kept large amounts of money in his home, no large amounts of cash were found at the victim's house or the Defendant's house. Detective Norrod acknowledged that this "wasn't a typical robbery, burglary type situation" because the only areas of the house that the perpetrator had obviously entered were the kitchen, dining room, master bedroom, and possibly the master bathroom. Nevertheless, he asserted that a robbery, burglary, and

murder had been committed. He also acknowledged that the perpetrator had not ransacked the victim's luxury sedan or the outbuilding on the victim's property. He affirmed that the Stanley sledgehammer that was recovered was consistent with the tool marks on the wall of the victim's home.

Detective Norrod stated that the surveillance video established that the Defendant left the victim's home just after 11:00 a.m. and that the victim's body was found just before 2:00 p.m. on March 31, 2017. He also stated that the Defendant's wife did not see him until she returned from work around 6:00 p.m. that day, which meant that the Defendant would have had the opportunity to dispose of or hide evidence from 11:00 a.m. until 6:00 p.m. He also said that the Defendant would have had time to hide the rifle and shotgun behind a wall and to conceal the chainsaw and leaf blower in an outbuilding on his property. Detective Norrod asserted that although the Defendant never admitted to taking the leaf blower, the surveillance video showed that he did. He also said that the Stanley sledgehammer that was recovered matched the description of the one provided by the Defendant himself.

Tracy Byrd, the Defendant's sister-in-law, testified that on August 17, 2018, she found in the living room of the Defendant's home a Stanley yellow-handled mini sledgehammer in a plastic bin. She said that she had never seen that sledgehammer prior to that day and that upon finding it, she immediately notified law enforcement, who collected it as evidence. She said that sometime later, her sister, the Defendant's wife, notified her that she had found two guns behind drywall in the Defendant's work room.

Stacy Oeser, the Defendant's wife, testified that although she was still legally married to the Defendant, she intended to divorce him. Mrs. Oeser[2] said that on the morning of March 31, 2017, the Defendant told her he was going to pay the electric bill and visit a friend in Nolensville. When she returned from work around 6:00 p.m. that evening, the Defendant was home, had just showered, and "seemed to be in a good mood." Later that night, they visited her daughter and grandchildren, and the Defendant "seemed fine" while playing with his grandchildren. On April 1, 2017, Mrs. Oeser said that they went to her parents' home, to her son's home in Goodlettsville, and finally to Nashville and that the Defendant also "seemed to be fine" and "[i]nteracted with [her] parents and [her] family." As they were returning home around midnight on April 1, 2017, officers pulled over their truck and arrested the Defendant. Shortly thereafter, officers executed a search warrant on the home she shared with the Defendant. Mrs. Oeser said that up until the moment of the Defendant's arrest, he never acted anything other than normal.

---

[2] Although we have not used titles when referring to most other witnesses, we have referred to the Defendant's wife as Mrs. Oeser, to distinguish her from the Defendant, who shares the same last name.

Mrs. Oeser stated that on June 13, 2017, the Defendant told her during a jail visit that he had a "present" for her behind the pegboard in his office. She said she looked there but was unable to find anything. Later, the Defendant instructed her to look again, and when she unscrewed the screws in the drywall, she found two guns inside the wall and immediately notified the police about them. Mrs. Oeser noted that her sister had found the Stanley sledgehammer inside the home she had shared with the Defendant. She confirmed that this sledgehammer, which was photographed and collected by the police, belonged to the Defendant.

Mrs. Oeser asserted that the Defendant had told her several different stories about what happened with the victim on March 31, 2017. First, the Defendant, during a jail visit, stated that the victim attacked him and that he was defending himself. Second, the Defendant told her "maybe the roommate had come back and had done that [to the victim]."

Mrs. Oeser said the Defendant also sent her a letter after his arrest, claiming that he went to the victim's house to buy some cocaine for someone else, and when he got there, he saw Jay Foster and the victim arguing outside. He claimed the victim had told him that he could borrow his leaf blower and chainsaw to do some work on another property. The Defendant said that after the victim got the cocaine from his bedroom, they went to the kitchen, and Jay Foster came in angry and slashed the victim's neck, and as the Defendant tried to stop him, Foster stabbed the victim with the knife in the stomach. The Defendant said he ran to the victim's bedroom to get the victim's guns to defend himself, and when he heard Foster leave the victim's home, he went back to the kitchen, where he saw the victim slumped over the kitchen table making noises. The Defendant claimed he was scared Foster was going to come back and get him, too, so he went to his truck and loaded the chainsaw, leaf blower, and guns into it and left.

Mrs. Oeser said that in a second letter to her, the Defendant claimed that he put on gloves because the chainsaw was greasy and that he loaded his truck with the chainsaw, leaf blower, and guns while wearing these gloves. He also claimed that if he had done something wrong, then he would have destroyed the recordings from the video cameras. He again blamed Jay Foster for the victim's death.

Finally, Mrs. Oeser stated that during a video jail visitation that pre-dated the two letters, the Defendant told her he had an altercation with the victim over some money and that the victim had "come at him with a knife" and he had deflected it, which caused the victim to stab himself. She said the Defendant then said that he picked up the first thing he saw on the table, which was the sledgehammer, and hit the victim with it.

Lisa Burgee, a Special Agent Forensic Scientist for the Tennessee Bureau of Investigation and an expert in the areas of serology and deoxyribonucleic acid (DNA),

testified that the blood stain on the baseball cap collected from the victim's closet had a DNA profile that was a mixture of two individuals, with the major contributor matching the victim and the minor contributor deemed inconclusive. She also testified that the inside headband of this baseball cap had a DNA profile that was a mixture of two individuals, with the major contributor matching the Defendant and the minor contributor deemed inconclusive. Agent Burgee stated that the probability of randomly selecting an unrelated individual with the same DNA profile as that of the stain and that of the inside headband of the baseball cap was one in a number greater than the current world population for African American, Caucasian, and Southwestern Hispanic populations. In addition, Agent Burgee stated that the DNA profiles of the blood stains from the driver's door and passenger's door of the Defendant's truck matched the victim's DNA, and "the statistic was above the world population."

Dr. Miguel Laboy, a forensic pathologist for the Middle Tennessee Regional Forensic Center and an expert in anatomical and forensic pathology, testified that he performed the victim's autopsy. He stated that the victim sustained blunt trauma to his head, multiple lacerations to his scalp and face, multiple fractures to his skull, contusions and hemorrhages to his brain, a stab wound to his neck, a cut blood vessel near his carotid artery, a stab wound to his abdomen, and abrasions to his left upper extremity. Dr. Laboy concluded that the victim's cause of death was "blunt force trauma to [the] head and sharp force injuries." He also concluded that the victim's manner of death was homicide. He asserted that the victim had been hit "at least seven times" in the head. He opined that while the stab wounds to the victim's neck occurred at or near the time of the victim's death, the stab wound to the victim's abdomen most likely occurred after the victim's death. Dr. Laboy confirmed that the toxicology report showed the victim had cocaine metabolites and cocaethylene in his system at the time of his death. He said that while he could not determine what affect these substances would have had on the victim's demeanor, the substances were present at a low level.

The Defendant waived his right to testify and offered no additional proof.

Following the conclusion of proof at trial, the jury convicted the Defendant as charged of first degree premeditated murder, first degree felony murder, especially aggravated robbery, aggravated burglary, and tampering with evidence. The trial court merged the first degree murder convictions and imposed an effective sentence of life imprisonment plus twenty years. The Defendant timely filed a motion for new trial, which the trial court denied. The Defendant then timely filed a notice of appeal.

## ANALYSIS

**I.   Sufficiency of the Evidence.**   The Defendant contends that "there was insufficient proof to find the killing of [the victim] to be premeditated and intentional." Specifically, he argues that the evidence did not show that he was "sufficiently free from excitement and passion as to be capable of premeditation." While the Defendant admits that he struck the victim with a hammer, he claims he did this only after the victim called him a name and he saw "red." He also asserts that the victim pulled a knife on him and held it to his head before he hit the victim. Lastly, he maintains that he did not procure the hammer prior to the killing and that he made no preparations to conceal the killing before it occurred, which he claims shows "a lack of premeditation." The State responds that it presented "ample evidence upon which the jury could determine that the murder was premeditated and intentional," including proof that the Defendant brought the sledgehammer to the victim's home, that the Defendant bludgeoned and stabbed the victim to death before stealing several valuable items and calmly loading them into his truck, that the Defendant concealed evidence of the murder, and that the Defendant went out with his wife the night the murder as if nothing had happened. After reviewing the record in this case, we agree with the State that the evidence is sufficient to sustain the Defendant's conviction for first degree premeditated murder.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing

Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

First degree murder, as applicable here, is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). "A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim." See State v. Page, 81 S.W.3d 781, 790 (Tenn. Crim. App. 2002) (Appendix); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.01. Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Clayton, 535 S.W.3d 829, 845 (Tenn. 2017) (citing State v. Dotson, 450 S.W.3d 1, 86 (Tenn. 2014); State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003)). "Proof of premeditation may be supported by either direct or circumstantial evidence." Id. (citing State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992)). Factors that may support the existence of premeditation include but are not limited to the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness after the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); Davidson, 121 S.W.3d at 615; Bland, 958 S.W.2d at 660.

- 10 -

A jury may also infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Methods of killing that require more time, effort, and intimate contact than the pulling of a trigger on a gun are more consistent with premeditation. State v. Adams, 405 S.W.3d 641, 663 (Tenn. 2013).

Viewing the evidence in the light most favorable to the State, we conclude that a rational jury could have found that the Defendant's killing of the victim was premeditated and intentional. The victim's roommate, Jay Foster, observed the Defendant come to the victim's home the day the victim died. Surveillance video recordings showed that the Defendant entered the victim's home and left several minutes later, wearing gloves and carrying a chainsaw, a leaf blower, two guns, a lockbox, and a suitcase to his truck.

The Defendant, after providing various stories concerning his actions the day of the victim's death, eventually admitted during his interview that he hit the victim in the head with a Stanley mini sledgehammer while he and the victim were alone in the victim's home. The Defendant said that after he hit the victim with the sledgehammer, the victim made gurgling noises, which prompted him to stab the victim in the stomach to prevent him from continuing to make these noises. The Defendant's statements during his interview also show that he fled the crime scene without contacting law enforcement and without attempting to render aid to the victim.

Although the Defendant acknowledged hitting the victim with the sledgehammer, he never explained where the sledgehammer came from or what he did with it after hitting the victim. Leah Whitehead Graves, Jessica Adcock, and Jay Foster all testified that the victim did not own a sledgehammer. The surveillance videos taken from the outside of the victim's home show that the Defendant was carrying something very heavy in the pocket of his jacket when he entered the victim's home. Because the evidence indicates that the Defendant brought one of the murder weapons with him to the scene, this is also indicative of premeditation.

In addition, the brutality of the victim's death strongly supports a finding of premeditation. The proof showed that the Defendant hit the victim's head several times with a sledgehammer before slashing the victim's throat and stabbing the victim in the abdomen. Officer Joseph Duncan testified the victim sustained serious trauma to his face and had a knife sticking out of his abdomen. Both he and Detective Norrod noted the substantial amount of blood in the kitchen near the victim. Dr. Laboy testified that the victim's cause of death was "blunt force trauma to [the] head and sharp force injuries." He asserted that the victim had been hit "at least seven times" in the head. He also stated that

- 11 -

while the stab wound to the victim's neck occurred at or near the time of death, the stab wound to the victim's abdomen most likely occurred after the victim's death.

Moreover, the Defendant's destruction and secretion of evidence of the killing supports the existence of premeditation. Tracy Byrd, the Defendant's sister-in-law, testified that on August 17, 2018, she found a Stanley sledgehammer in a plastic bin in the Defendant's home, and she immediately contacted law enforcement. Detective Norrod stated his belief that the Defendant had placed this sledgehammer in his father in law's toolbox when he visited him the day after the victim's death and that someone else had moved the sledgehammer from the father-in-law's toolbox back to the Defendant's home, where home renovations were taking place. Although Leah Whitehead Graves testified that the victim often kept large amounts of cash in his house, no cash was found in the victim's home after his murder. Shortly after the Defendant's arrest, the leaf blower and chainsaw that the Defendant had taken from the victim were found in the Defendant's storage barn. Still later, the Defendant told his wife to search behind a wall in their home, where she found the shotgun and rifle that had been taken from the victim. The clothes the Defendant was wearing at the time of the killing were never found.

Lastly, the Defendant's calm demeanor following the murder also indicates that he acted with premeditation. The video surveillance at the victim's home shows the Defendant serenely loading the guns, a lockbox, a suitcase, a leaf blower, and a chainsaw into his truck after the victim's death. Stacy Oeser, the Defendant's wife, testified that when she got home the afternoon of March 31, 2017, the Defendant had showered and "seemed to be in a good mood." She said they visited her daughter and grandchildren, and the Defendant "seemed fine[.]" The next day, she and the Defendant visited her parent's home and her son's home, and the Defendant "seemed to be fine" when interacting with her family. Mrs. Oeser said that up until the Defendant's arrest, he never acted anything other than normal.

The jury, after hearing all the proof in this case, rejected the theories that the Defendant acted in self-defense or witnessed a murder committed by someone else. We will not second-guess the jury's determination regarding the credibility of witnesses or the weight afforded to the evidence. Given the overwhelming proof that the victim's killing was premeditated and intentional, we conclude that the evidence is sufficient to sustain the Defendant's conviction for first degree premeditated murder.[3]

---

[3] Although not argued by the Defendant on appeal, we also conclude that the evidence is sufficient to sustain his conviction for first degree felony murder. As relevant in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "A killing that precedes, coincides with, or follows the commission of an underlying felony will be considered 'in the perpetration of' the underlying felony, so long as there is a connection in time, place, and continuity of action." State v. Wagner, 382 S.W.3d 289, 299 (Tenn. 2012)

**II. Consecutive Sentencing.** The Defendant also argues that the trial court abused its discretion in ordering the sentences for his especially aggravated robbery, aggravated burglary, and tampering with evidence convictions served consecutively to his life sentence for first degree murder. Although the Defendant acknowledges that his convictions are serious offenses, he asserts that he has no prior criminal history. He also contends that he never intended to kill the victim, that he only went to the victim's home to "borrow some tools and to pick up a small amount of cocaine for a mutual acquaintance," and that he "reacted to the victim's actions[,] which led to the tragic outcome." Finally, he maintains that the trial court, in determining that he was a dangerous offender for the purpose of consecutive sentencing, failed to make the additional findings required by State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). He claims that just because he was convicted of two or more dangerous crimes does not mean that he is automatically a dangerous offender subject to consecutive sentencing." See id. at 938. The State responds that the trial court did not abuse its discretion in imposing consecutive sentencing in this case. We agree with the State.

At the Defendant's sentencing hearing for his convictions for especially aggravated robbery, aggravated burglary, and tampering with evidence, the State entered the presentence investigation report into evidence before presenting testimony from the victim's sister, the victim's father, and the victim's ex-wife. The Defendant presented no proof but read a lengthy statement of allocution, wherein he claimed that the victim thrust the fillet knife at his left eye, which caused him to grab a sledgehammer from the table and swing "blindly" at the victim before running to the victim's closet and attempting to load the victim's two guns. The Defendant said he could hear noises coming from the kitchen, so he returned to the kitchen with one of the guns in his hands, and the victim continued to make noises, which he took as a threat. He said he found the fillet knife on the table and ran it across the victim's neck twice and then stabbed the victim in the stomach. He claimed that he was "scared and threatened" during the incident and that he "reacted." The Defendant insisted that he originally went to the victim's home to borrow the victim's

---

(citing State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000); State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). There should also be a causal connection between the killing and the underlying felony. Buggs, 995 S.W.3d at 106 (citing Farmer v. State, 296 S.W.2d 879, 884 (Tenn. 1956); State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). In a felony murder case, the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Id. at 107. Moreover, "a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). Because a rational jury could have inferred from the proof presented at trial that the Defendant had the intent to commit the robbery prior to, or concurrent with, the killing of the victim, we conclude that the evidence is sufficient to sustain the Defendant's conviction for first degree felony murder.

- 13 -

chainsaw and leaf blower and to pick up a gram of cocaine for a friend and that he never intended to rob the victim. The Defendant then announced, "And to the [victim's] family, all of you, I apologize for what I had to do. But again, we would not be here if [the victim] had not attacked me."

The trial court determined that the Defendant was a Range I, standard offender, though it recognized that the Defendant's sentence for especially aggravated robbery would be served at one hundred percent release eligibility pursuant to Code section 40-35-501(i). The trial court then applied three enhancement factors to the Defendant's aggravated burglary conviction. See Tenn. Code Ann. §§ 40-35-114(5), -114(6), -114(9). The trial court found that no mitigating factors applied. See id. § 40-35-113.

As to whether the sentences for the especially aggravated robbery, aggravated burglary, and tampering with evidence convictions would be served concurrently or consecutively to one another and to the Defendant's life sentence, the trial court found that "the Defendant was a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." See id. § 40-35-115(b)(4). In support of its determination that the Defendant was a "dangerous offender," the trial court made the following findings:

> And all three of the following factors apply. That the circumstances surrounding the commission of the offense are aggravated. The Court notes the State's statement that [the Defendant's allocution] was the sixth story the State has heard as to how this offense occurred.

> This Court spent a considerable amount of time going over the considerable amount of discovery provided in the case prior to trial and heard numerous explanations by [the Defendant] in an attempt to excuse his behavior, and at some points denying what the video evidence obviously showed.

> That he went into the house. That the only other person there left— and that while he was in the house, he committed a brutal crime to such an extent that the person who found [the victim] was unable to render aid because he couldn't tell what part of his body he needed to render aid to.
> And not content with six or seven blows from a hammer to [the victim's] head, [the Defendant] used a fillet knife and sliced [the victim's] throat and . . . perpetrated other stabbing wounds to [the victim]. Some of those were inflicted after the point that [the victim], according to the medical examiner, was deceased.

And at one point [the Defendant] said there were some noises [coming from the victim], and I wanted to stop the noise. It was a gruesome, gruesome crime.

Further, the Court finds confinement for an extended period of time is necessary to protect society from the Defendant's unwillingness to lead a productive life, and the Defendant's resort to criminal activity in furtherance of an anti-societal lifestyle.

[The Defendant] presents himself as someone who is trained and skilled and highly employable. Yet, he was dependent on his wife's income at the time. He, himself, was spending his time trying to get meds. And then in furtherance of drug activity, visiting people, collecting drugs, making payments for drugs in exchange to deliver to those drugs to other people.

Finally, the Court finds the aggregate length of the sentences reasonably relate to the offenses for which the Defendant stands convicted.

The Court finds an extended sentence is necessary to protect the public from further criminal conduct by the Defendant, and that consecutive sentences reasonably relate to the severity of the offenses committed.

The Court is still somewhat shocked that after all that occurred, [the Defendant] took the time to casually load guns in the back of his vehicle, to go back into the curtilage of [the victim's] home, pick up other items, load them in his vehicle, drive away, go to his home, secure those items where they couldn't be readily located to the extent that he hid guns behind the wall and closed them in so that even after he told his wife one time to go look, she couldn't find them.

Regarding the Defendant's criminal history, the trial court recognized that the Defendant had "not been convicted or charged except for some crimes . . . in Wilson County that apparently nobody can find a record of as to how they were resolved." The court added, "[The Defendant] did have a couple of other minor criminal run-in's [sic]. However, based on his own statements, he's been involved in drug traffic[king], continued to be in drug traffic[king]."

The Court then sentenced the Defendant to twenty years at one hundred percent for the especially aggravated robbery conviction, five years at thirty percent for the aggravated

- 15 -

burglary conviction, and five years at thirty percent for the tampering with evidence conviction, with these sentences served concurrently with one another but consecutively to the life sentence, for an effective sentence of life plus twenty years at one hundred percent.

In Pollard, the Tennessee Supreme Court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see State v. Bise, 380 S.W.3d 682,708 (Tenn. 2012); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The court explained that "the presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. It reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, the trial court imposed consecutive sentencing after finding that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). The Pollard court explained that two additional findings must be made when applying this dangerous offender classification:

"Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles

- 16 -

set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences."

Pollard, 432 S.W.3d at 863 (alternation and emphasis in original) (quoting Wilkerson, 905 S.W.2d at 938). Therefore, when imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must make specific findings that that the aggregate sentence is "reasonably related to the severity of the offenses committed" and "necessary in order to protect the public from further criminal acts." Id.; State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999) (citing Wilkerson, 905 S.W.2d at 939). Unlike the other six subsections, the trial court must make additional findings for the dangerous offender classification because it is "the most subjective and hardest to apply." Lane, 3 S.W.3d at 461.

In this case, the trial court determined that the aggregate sentence was reasonably related to the severity of the offenses committed. The court noted that the Defendant had committed a "gruesome" and "brutal crime" that consisted not only of "six or seven blows from a hammer to [the victim's] head," but also the use of "a fillet knife" to "slice[] [the victim's] throat" and perpetrate "other stabbing wounds to [the victim]." The court also recognized that the Defendant inflicted some of these stabbing wounds after the victim was deceased. In addition, the trial court asserted that the Defendant had told numerous stories as to how this offense had occurred, including the one in his statement of allocution; had repeatedly attempted to excuse his behavior; and had denied what the video evidence in this case clearly showed.

The trial court also found that the aggregate sentence was necessary in order to protect the public from further criminal acts by the Defendant. The court specifically noted the Defendant's "unwillingness to lead a productive life" and his decision to "resort to criminal activity in furtherance of an anti-societal lifestyle." It recognized that although the Defendant, an engineer, was highly skilled and employable, he was dependent on his wife's income and spent his time obtaining prescription medications and trafficking illegal drugs.

The trial court's findings regarding the dangerous offender classification are fully supported by the record. Although the Defendant contends that the trial court erred in failing to consider his lack of criminal history, the record shows that the trial court considered his criminal history and then determined that the Defendant, by his own admission, had been actively engaged in drug trafficking. Moreover, while the Defendant contends that he killed the victim in self-defense, the trial court noted that the evidence of premeditation was overwhelming. Finally, although the Defendant argues that the trial

court failed to make the additional findings required by State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), the record shows that the trial court provided extensive, detailed findings regarding the Wilkerson factors. Accordingly, we conclude that the trial court did not abuse its discretion in ordering that the Defendant's sentences for his especially aggravated robbery, aggravated burglary, and tampering with evidence convictions be served consecutively to his life sentence for first degree murder.

As a final note, we detect some clerical errors in the judgment forms that require correction. Here, the transcripts show that the trial court merged Count 1, the conviction for first degree premeditated murder, and Count 3, the conviction for first degree felony murder, but neglected to determine which conviction would be the greater or surviving conviction. In addition, the two judgment forms entered for these counts state only that "Counts 1 & 3 merge." In a case such as this one, when two convictions merge, it is proper for the trial court to determine which conviction is the greater or surviving conviction. See State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015) (order for publication summarily granting the application of the defendant under Rule 11 of the Tennessee Rules of Appellate Procedure and reversing a portion of the judgment of the Tennessee Court of Criminal Appeals) ("Additionally, the judgment document should indicate in the 'Special Conditions' box that the conviction merges with the greater conviction. To avoid confusion, the merger also should be noted in the 'Special Conditions' box on the uniform judgment document for the greater or surviving conviction."). Therefore, we remand this case to the trial court for entry of corrected judgment forms in Count 1 and Count 3. On remand, the trial court should once again impose separate sentences for the convictions in Count 1 and Count 3, should place these sentences on separate judgment forms, and should note in the "Special Conditions" box on each judgment form whether Count 1 or Count 3 is the greater or surviving conviction following merger. See id.

## CONCLUSION

We remand this case for entry of corrected judgment forms in Counts 1 and 3 as specified in this opinion, but in all other respects, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 18 -